# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

DARELL DEVON MOORE,

     Plaintiff,

v.                                Case No.  3:19-cv-799-MMH-JBT

H. GEORGE, et al.,

     Defendants.

_____

## <u>ORDER</u>

### I. Status

Plaintiff Darell Devon Moore, an inmate in the custody of the Florida Department of Corrections (FDOC), initiated this action on June 30, 2019, pursuant to the mailbox rule,[1] by filing a pro se Civil Rights Complaint (Doc. 1; Complaint) under 42 U.S.C. § 1983. As Defendants, Moore sues Dr. H. George, Nurse Tyler D. Oswald, and Nurse Danielle M. Pippins Lee in their individual capacities. Complaint at 1-2. Moore asserts Defendants were deliberately indifferent to his serious medical needs in violation of his rights protected by the Eighth Amendment to the United States Constitution. See generally id. As relief, Moore seeks $150,000 in compensatory damages and

_____

[1] See <u>Houston v. Lack</u>, 487 U.S. 266, 276 (1988) (under the mailbox rule, pleadings are filed on the respective date that an inmate hands the pleading to prison authorities for mailing to the court).

$150,000 in punitive damages against each Defendant, as well as declaratory relief and any additional relief that the Court deems just, proper, and equitable. Id. at 10.

Before the Court is the Motion to Dismiss filed by Defendants Lee and Oswald, in which Defendants argue that Moore failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act (PLRA), before filing the instant 42 U.S.C. § 1983 lawsuit. See Defendants Danielle M. Pippins Lee and Tyler D. Oswald's Motion to Dismiss and Incorporated Memorandum of Law (Doc. 24; Motion). The Court advised Moore that the granting of a motion to dismiss would be an adjudication of the case that could foreclose subsequent litigation on the matter and allowed him an opportunity to respond to the Motion. See Order of Special Appointment; Directing Service of Process upon Defendants; Notice to Plaintiff (Doc. 8.). Moore filed his response in opposition to the Motion. See Plaintiff's Opposition to Defendants Danielle M. Pippin Lee and Tyler D. Oswald's Motion to Dismiss and Incorporated Memorandum of Law (Doc. 31; Response). With leave of the Court, Defendants filed a reply in support of their Motion. See Defendants Danielle M. Pippin Lee and Tyler D. Oswald's Reply in Support of their Motion to Dismiss (Doc. 34; Reply). Thus, the Motion is ripe for review.

## II. Moore's Allegations

In his Complaint, Moore alleges that on March 5, 2018, while housed at Columbia Correctional Institution, another prisoner threw a lock at Moore, hitting Moore above his left eye. Complaint at 3. Moore asserts he defended himself against the prisoner, causing the prisoner's blood to get "all over" Moore. Id. Following the altercation, Defendant Oswald conducted a medical evaluation of Moore, during which Moore alleges that he advised Oswald that he could not see out of his left eye and that his vision was blurry. Id. Moore contends that he also told Oswald that he had "excruciating pain in the head and eye." Id. Moore asserts that Oswald ignored Moore's complaints and insisted that Moore disclose the name of the other prisoner involved in the altercation, whose blood now covered Moore's clothing. Id.

According to Moore, Defendant George entered the exam room and also began asking about the blood all over Moore's clothing. Id. Moore explains that he then advised George that the vision in his left eye was blurry and he could not see out of it. Id. at 4. Moore asserts that George ignored Moore's "complaints and continued to inquire into the blood on [Moore's] clothing." Id. Moore states that when he told Defendants George and Oswald that he did not know the name of the other prisoner, George and Oswald became angry at Moore. Id. He states "Oswald started yelling a[t] [Moore] that the other prisoner could die if he did not tell them the other prisoner[']s name." Id. When

Moore again advised that he did not know the other prisoner's name, Moore contends that George refused to suture the laceration above Moore's eye and instead closed the gash using derma bond. Id. Moore alleges he continued to tell George that he was experiencing head and eye pain and that he could not see out of his left eye, but George responded that he did not care. Id.

According to Moore, George then ordered Moore to leave the treatment room, and prison officials took Moore to confinement. Id. at 5. Moore alleges that because of the blunt force trauma, he began losing consciousness while in his cell. Id. He contends that an unknown individual escorted him back to medical and sat him in a chair where Moore started vomiting. Id. Moore asserts Oswald saw him vomiting and losing consciousness "but she did nothing." Id. Moore states he again told Oswald that he was still experiencing left eye pain, felt dizzy, and could not see out of his left eye, but "Oswald ignored [his] complaints and walked away." Id. According to Moore, an unknown individual then escorted Moore back to his confinement cell. Id.

On March 8, 2018, Moore began feeling an increase in left-eye pressure and tried to declare a medical emergency, but all security officers ignored him. Id. at 6. Moore states that on March 10, 2018, he declared another medical emergency and security took him to medical where Defendant Lee conducted an evaluation. Id. Moore states he advised Lee that his left eye hurt, his left-eye vision was gone, and he was experiencing headaches. Id. Lee noted his

sclera was red and swollen, but advised Moore there was nothing she could do for him, so against his protest, Lee sent Moore back to his cell. Id. Moore alleges he tried to declare another medical emergency on March 15, 2018, but security again ignored his pleas. Id.

According to Moore, on March 16, 2018, while getting off his bunk, he lost consciousness. Id. at 7. Medical staff woke Moore and escorted him to Nurse Downs for a medical evaluation. Id. Nurse Downs documented: "left eye and surrounding tissue swollen" and "sclera of left eye red." Id. He advised Nurse Downs that he had left-eye pressure and had been in pain since March 5, 2018. Id. Moore alleges that Nurse Downs advised there was nothing she could do for him and that he would have to wait until Monday to see the doctor. Id. She gave Moore a "handful of ibuprofen" and sent him back to his confinement cell. Id. The next day, March 17, 2018, when Defendant George was called into the facility to address an unrelated medical emergency, Nurse Downs arranged for Defendant George to evaluate Moore. Id. After his medical assessment, George sent Moore to U.F. Health Shands. Id.

Moore alleges that hospital doctors immediately conducted a left eye anterior chamber washout on March 18, 2018. Id. at 8. Hospital staff discharged Moore on March 20, 2018; and prison officials transported him back to the hospital for a follow-up on March 30, 2018. Id. He asserts that on June 27, 2018, he had another follow-up with the hospital, during which the eye

doctor advised Moore "there was nothing that could be done to save his left eye because the prison had waited too long to send [him] out for surgery." Id. at 8. According to Moore, the doctor explained that "had [Moore] been brought to the hospital for surgery on March 5, 2018, then they would have been able to save the vision in [his] left eye"; but, "because it had been so long, the pressure had built up to[o] high and damaged [his] eye beyond repair." Id. Moore contends Defendants Oswald and Lee were deliberately indifferent to his serious medical needs. As a result of their actions, Moore asserts he suffered permanent vision loss in his left eye, pain, suffering, physical injury, and emotional distress. Id. at 9-10.

### III. Dismissal of Claims against Defendant George

Before addressing the merits of the arguments presented by Defendants Oswald and Lee, the Court addresses the status of Moore's prosecution of his claim against Defendant George. On September 9, 2019, the Court directed service of process on all Defendants. See Order of Special Appointment (Doc. 8). When the United States Marshals returned service of process as unexecuted for Defendant George on October 1, 2019 (see Doc. 9), the Court requested that the FDOC provide the Court with the last known place of employment or

address for Defendant George by November 25, 2019 (see Order (Doc. 13)).[2] The Court then sua sponte extended the FDOC's deadline to comply with the Court's Order until February 28, 2020. See Order (Doc. 15). On March 3, 2020, counsel for the FDOC filed a notice regarding service of process for Defendant George, advising that Defendant George was an employee of a contracted medical provider, and thus, the FDOC was unable to provide the last known address for him. See Department of Corrections' Notice to Court Regarding Service of Process for Defendants (Doc. 19).

In light of the FDOC's notice, the Court directed Moore to file a notice, by April 3, 2020, with additional information to identify and serve George. See Order (Doc. 20). When Moore failed to file a notice by the deadline, the Court directed Moore to show cause by May 21, 2020, as to why the claims against George should not be dismissed for Moore's failure to timely comply with the Court's previous Order. See Order to Show Cause (Doc. 23). Thereafter, due to the COVID-19 pandemic and associated restrictions, the Court sua sponte extended the deadline for Moore to comply with the Court's Order to Show Cause until July 2, 2020. See Order (Doc. 28). The Court advised Moore that failure to timely comply would result in the dismissal of the claims against

---

[2] The United States Marshals also returned service of process for Defendant Oswald as unexecuted (see Doc. 10); however, after counsel filed a notice of appearance on behalf of Defendant Oswald (see Doc. 17), Defendant Oswald waived service of process on March 20, 2020 (see Doc. 21).

Defendant George without further notice.[3] Id. As of the date of this Order, more than seven months have passed since the deadline expired and Moore has neither complied with the Court's Orders (Docs. 20, 23, 28), nor requested additional time to do so. Given that the designated time to respond to the Court's Order (Doc. 23) passed on July 2, 2020, this Court concludes that dismissal without prejudice of all claims against Defendant George is appropriate at this time.

## IV. Summary of Parties Positions on Exhaustion

Defendants Lee and Oswald request dismissal of Moore's claims against them because Moore failed to exhaust his administrative remedies before filing suit. See generally Motion. They argue Moore "did not even initiate the [FDOC's] three-step [grievance] process," and assert that Moore's "grievance file does not reveal any pre-lawsuit grievance complaints about Lee, Oswald, or the medical treatment for [his] eye injury." Id. at 4. In support of their Motion, Defendants provide a "Compilation of [Moore's] Grievance File" (see id. at 2), which contains three informal grievances and two direct emergency grievances that Moore submitted between September 2018 and December 2019 (see generally Doc. 27). The only grievance that seemingly references Moore's

---

[3] On June 19, 2020, the Court reminded Moore to comply with the Court's Order to Show Cause (Doc. 23) by July 2, 2020. See Order (Doc. 30). He has not done so.

eye injury is a September 5, 2018 informal grievance, which states the following:

> I just went to the eye doctor and found out I'll never gain back my vision in my left eye due to the incident that landed me on CM. It[']s hard for me to cope with. I'm only 22 years old, how am I suppose[d] to make a living? If you could give me some mental exercises or something, this is an emotional strain on me. I would be gr[]at[e]ful for any help you can give.

Doc. 27 at 4. FDOC officials responded to this informal grievance on September 10, 2018, advising Moore he had an appointment with mental health scheduled for October and recommending he discuss his issues at that time. Id. The record presented contains no evidence that Moore sought any further administrative review of this informal grievance. See generally Doc. 27.

The other four grievances that Defendants provide were filed in 2019. See id. at 6, 7, 8, 11. In three of these 2019 grievances, Moore requests compensation for property that the FDOC allegedly failed to return to him. See id. at 6, 7, 8. And in the fourth grievance, Moore requests that the FDOC allow prisoners to purchase "adult magazines" or "adult films." Id. at 11.

In his Response, Moore argues that he tried to exhaust his administrative remedies "by placing in the grievance box, several [g]rievances of medical nature directly to the (Warden) after March 5, 2018, and after March 10, 2018; but [he] never received a [g]rievance receipt or response to any of the [g]rievances." Response at 4. According to Moore, "as an alternate

method to exhaust his administrative remedies," on March 15, 2018, he began mailing to the Secretary, Inspector General, and the operations manager of the Chief Inspector General's Office letters complaining about Defendants' denial of medical treatment and advising that the FDOC refused to respond to his grievances. Id. at 2, 4. In support of this assertion, Moore attaches three seemingly identical letters dated March 15, 2018 – the first addressed to Julie Jones, the former Secretary of the FDOC; the second addressed to Lester Fernandez, Inspector General; and the third addressed to Heather Robinson, Operations Manager of the Office of the Inspector General. See Doc. 31-1 at 2-7. In each of these three letters, Moore alleges he has been denied medical treatment for his left-eye injury. Id. Further, in the letters to Jones and Fernandez, Moore alleges the following:

> I am writ[]ing this letter because I have written grievances and hav[e]n't even received a response to my grievances, nor have I received a grievance receipt. I believe the grievance office is throwing my grievances away. The grievance office is hindering [] my efforts to exhaust my grievance remedies.

Id. at 3, 5.[4] Moore also attaches a July 25, 2018 follow-up letter to Robinson, asking whether Robinson received his March 15, 2018 letter "concerning

---

[4] Moore only attaches the first page of his March 15, 2018 letter to Robinson. See Doc. 31-1 at 6.

[Moore] being denied medical treatment at Columbia C.I. and also about the grievance office throwing [his] grievances away." Id. at 7.

Moore also alleges his mother, Charnessia Johnson, directly emailed the warden at Columbia asking about her son's condition and advising that Moore was not receiving medical treatment. Response at 4-5. Based on these communications, according to Moore, the warden received notice of Moore's claim even though the warden did not receive Moore's grievances. Id. at 5. To support his contention, Moore provides printouts of thirteen emails Johnson sent to the warden between March 20, 2018 and May 23, 2018, and printouts of eight of the warden's responses to those emails. See generally Doc. 31-2. A review of Johnson's emails shows that Moore advised Johnson that on March 5, 2018, officials moved him to confinement after he got into an altercation resulting in a severe eye injury, and that while in confinement, Moore did not receive medical treatment for twelve to thirteen days. Id. at 2. Johnson's emails also state that an "eye specialist" had contacted Johnson about the prison's failure to transport Moore for follow-up appointments, asking why prison officials ignored Moore's complaints about eye pain, and arguing that prison officials' actions caused Moore's vision loss. Id. at 6.

Moore further asserts Johnson filed a complaint directly with the Inspector General's Office and that "Inspector Jonathan Hanson advised the [c]omplaint would be forwarded to the Health Service Department for review

11

and action." Id. at 5. In support of that claim, Moore provides a printout of Inspector General's Office employee Jonathan Hanson's May 24, 2018 email to Johnson stating that Johnson had a "case" pending review; a July 21, 2018 email from Johnson to Hanson about Moore's delay in medical treatment; and Hanson's July 23, 2018 email advising the matter would be referred to Health Services. See Doc. 31-3. Moore argues that this record evidence shows he "made all the necessary attempts to exhaust his" administrative remedies, but prison officials hindered his efforts to file grievances and rendered the grievance process unavailable, which he claims is common at Columbia C.I. Response at 5.

## V. Analysis

The PLRA requires that Moore exhaust his available administrative remedies before pursuing a § 1983 claim about prison conditions. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted."); see also Woodford v. Ngo, 548 U.S. 81, 92-93 (2006) (noting that a prisoner must exhaust administrative remedies before challenging the conditions of confinement, and concluding that the PLRA demands "proper exhaustion"). Nevertheless, Moore need not "specially plead or demonstrate exhaustion in [his] complaint[]." See Jones v. Bock, 549 U.S. 199, 216 (2007).

12

Instead, the United States Supreme Court has recognized that "failure to exhaust is an affirmative defense under the PLRA[.]" Id.

Importantly, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits." Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). See also Jones, 549 U.S. at 211. The Supreme Court has instructed that while "the PLRA exhaustion requirement is not jurisdictional[,]" Woodford, 548 U.S. at 101, "exhaustion is mandatory . . . and unexhausted claims cannot be brought," Pavao v. Sims, 679 F. App'x 819, 823 (11th Cir. 2017) (per curiam) (citing Jones, 549 U.S. at 211). Not only is there a recognized exhaustion requirement, "the PLRA . . . requires proper exhaustion" as set forth in applicable administrative rules and policies of the institution. Woodford, 548 U.S. at 93.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."

Id. at 90 (citation omitted). Indeed, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]" Id.

13

In <u>Ross v. Blake</u>, the Supreme Court instructed that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" 136 S. Ct. 1850, 1862 (2016). For an administrative remedy to be available, the "remedy must be 'capable of use for the accomplishment of [its] purpose.'" <u>Turner v. Burnside</u>, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting <u>Goebert v. Lee Cnty.</u>, 510 F.3d 1312, 1322-23 (11th Cir. 2007)). In <u>Ross</u>, the Court identified three circumstances in which an administrative remedy would be considered "not available." <u>Ross</u>, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." <u>Id.</u> Next, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." <u>Id.</u> Finally, a remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." <u>Id.</u> at 1860.

Because failure to exhaust administrative remedies is an affirmative defense, Defendants Lee and Oswald bear "the burden of proving that [Moore] has failed to exhaust his available administrative remedies." <u>Turner v.</u>

Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008). The Eleventh Circuit has articulated a two-step process that the Court must employ when examining the issue of exhaustion of administrative remedies.

> In Turner v. Burnside we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. Id. Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. Id. at 1082–83; see also id. at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015).

State law "determines what steps are required to exhaust." Dimanche v. Brown, 783 F.3d 1204, 1207 (11th Cir. 2015); see also Jones, 549 U.S. at 218 (stating that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion"). The FDOC provides inmates with a three-step grievance process for exhausting administrative remedies. As the Eleventh Circuit has described it:

> The grievance procedure applicable to Florida prisoners is set out in § 33-103 of the Florida Administrative Code. Section 33-103 contemplates a three-step sequential grievance procedure: (1) informal grievance; (2) formal grievance; and then (3)

> administrative appeal. <u>Dimanche</u>, 783 F.3d at 1211.
> Informal grievances are handled by the staff member
> responsible for the particular area of the problem at
> the institution; formal grievances are handled by the
> warden of the institution; and administrative appeals
> are handled by the Office of the Secretary of the
> FDOC. <u>See</u> Fla. Admin. Code. §§ 33-103.005–103.007.
> To exhaust these remedies, prisoners ordinarily must
> complete these steps in order and within the time
> limits set forth in § 33-103.011, and must either
> receive a response or wait a certain period of time
> before proceeding to the next step. <u>See</u> <u>id.</u> § 33-
> 103.011(4).

<u>Pavao</u>, 679 F. App'x at 824. However, the ordinary three-step procedure does

not necessarily apply in all instances. A prisoner may skip the informal

grievance step and immediately file a formal grievance for issues pertaining to

various things, including "medical grievances" or "a formal grievance of a

medical nature." Fla. Admin.  Code r. 33-103.005(1); Fla. Admin. Code r. 33-

103.008. If a prisoner is permitted to bypass the informal grievance step, he

must file the formal grievance with the warden within 15 days from the date

on which the incident or action being grieved occurred. Fla. Admin. Code r. 33-

103.011(1)(b). A response must be provided to the inmate within 20 days of

receipt of the formal grievance. Fla. Admin. Code r. 33-103.006(6). "If the

inmate is unsatisfied with the resolution of a formal grievance, he may appeal

the grievance to the Office of the Secretary using Form DC1-303 (same form as

a formal grievance)." <u>Jenkins v. Sloan</u>, 826 F. App'x 833, 835 (11th Cir. 2020)

(citing Fla. Admin. Code Ann. R. 33-103.007). The grievance appeal to the

16

Office of the Secretary must be received within 15 days from the date the response to the formal grievance is returned to the inmate. Fla. Admin. Code r. 33-103.11(c).

Further, an inmate may skip the informal and formal grievance steps and file a direct emergency grievance with the Office of the Secretary, if the issue involves an emergency, reprisal, protective management, admissible reading material, release date calculations, banking issues, sexual abuse committed by the warden, or HIPAA violations. Fla. Admin. Code r. 33-103.007(3)(a). When a prisoner files a direct emergency grievance with the Secretary, he must do so "within 15 calendar days from the date on which the incident or action which is the subject of the grievance occurred." Fla. Admin. Code r. 33-103.011(d).

Here, the Court finds that Moore's allegations in the Response, taken as true, preclude dismissal of this action at the first step of Turner. See Ross, 136 S. Ct. at 1860; see also Jackson v. Griffin, 762 F. App'x 744, 746 (11th Cir. 2019) (holding disputes about availability of administrative remedies are questions of fact that can bar dismissal at Turner's first step). As such, the Court will proceed to Turner's second step and make specific findings to resolve the disputed factual issues related to exhaustion.

In resolving the disputed factual issues here, the Court finds that Moore did not complete the administrative process in accordance with applicable

grievance procedures set forth in rule 33-103 of the Florida Administrative Code. Moore alleges that he attempted to exhaust his administrative remedies by bypassing the informal grievance step and filing multiple formal grievances of a medical nature directly with the warden to initiate the process. Even accepting that assertion as true, however, Moore does not allege that he filed a grievance appeal with the Secretary to fully exhaust his administrative remedies under that two-step route. While Moore argues that his March 15, 2018 letter to the Secretary (Doc. 31-1) should be seen as an "alternate method to exhaust his administrative remedies," nothing in the record suggests that he intended the letter to be a grievance appeal or that the Secretary treated the letter as a grievance appeal. Indeed, because Moore alleges he continued to file formal grievances with the warden "after March 10, 2018," a March 15, 2018 grievance appeal would have been premature.

Further, Moore's March 15, 2018 letters to the Secretary, the Inspector General, and the Operations Manager of the Office of the Chief Inspector General did not satisfy the requirements of a direct emergency grievance. See Schlicher v. Fla. Dep't of Corr., 399 F. App'x 538, 539 (11th Cir. 2010) (rejecting the plaintiff's argument that writing letters to the Secretary of the FDOC, a federal judge, and the inspector general, and making verbal complaints to various prison officials, were sufficient to satisfy the exhaustion requirement); see, e.g., Bracero v. Sec'y, Fla. Dep't of Corr., 748 F. App'x 200, 203 (11th Cir.

2018) (citing Fla. Admin. Code r. 33-103.007(6)(a) and finding the plaintiff's letter to Secretary did not qualify as direct grievance). Thus, these letters cannot replace the filing of grievances in accordance with the administrative grievance process.

Johnson's email exchange with the warden also did not excuse Moore from complying with the FDOC's grievance process. See Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000) (holding that "when a state provides a grievance procedure for its prisoners, . . . an inmate alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit"). Notably, even if the emails to the warden could be seen as formal grievances of a medical nature, the record is still devoid of evidence that Moore filed a grievance appeal with the Secretary afterward. Too, Johnson's email exchange and complaint filed with the Office of the Inspector General "are not relevant to the question of exhaustion because they are not part of the prison grievance procedure, and therefore are outside the 'boundaries of proper exhaustion.'" Pavao, 679 F. App'x at 825 (finding that the plaintiff's efforts to seek redress from Inspector General did not show exhaustion).

As an alternate argument, Moore contends that his administrative remedies were unavailable, relieving him of any obligation to complete the applicable grievance process. He advances two theories in support of

19

unavailability. First, he asserts that the warden's failure to respond to his grievances prevented him from completing the grievance process. But the warden's failure to respond does not render the process unavailable. Indeed, even assuming the warden failed to respond to the formal grievances, "the grievance procedure provides that [Moore] could have 'proceed[ed] to the next step of the grievance process' – administrative appeal – after the expiration of the 20 days." Pavao, 679 F. App'x at 826 (quoting Fla. Admin. Code § 33-103.011(3), (4)). "Because [Moore] could have proceeded by filing an administrative appeal, the PLRA still requires him to file an appeal notwithstanding the prison's lack of response." Id. (citing Turner, 541 F.3d at 1084, for the proposition that "a prison's failure to respond to a formal grievance did not relieve the prisoner of his obligation to file an appeal when the grievance procedure provided that prisoners could file an appeal if they did not receive a response to a formal grievance within 30 days.").

Second, Moore argues that his administrative remedies were unavailable, because "grievance office staff [threw] [his] grievances away" and hindered his attempts to exhaust, "which is common at Columbia C.I." Response at 3, 5. But Moore's conclusory assumption that his formal grievances were being destroyed does not amount to the type of intimidation that would render a grievance process unavailable. For example, Moore does not allege that prison officials withheld from him administrative remedy

forms. Instead, the record shows that he had access to the necessary form for submitting a grievance appeal to the Secretary, because he would have used that same form to file his many formal grievances with the warden. See Jenkins, 826 F. App'x at 836 ("[i]f an inmate is unsatisfied with the resolution of a formal grievance, he may appeal the grievance to the Office of the Secretary using Form DC1-303 (same form as a formal grievance)"). Moore also does not allege that prison officials engaged in any threatening or retaliatory behavior that deterred him from filing a grievance appeal with the Secretary. See Turner, 541 F.3d at 1085 (holding that a prison official's threats of retaliation can render grievance process unavailable if: "(1) the threat actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process; and (2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude" from participating in the process). Moreover, as noted above, even if guards had intercepted his grievances, Moore could and should have completed the grievance process by submitting an administrative appeal when he received no response after twenty days. See Pavao, 679 F. App'x at 826. He did not do so.

For these reasons, despite Moore's efforts to inform officials of Defendants' alleged misconduct, Moore did not properly exhaust the administrative remedies available to him. As such, the Motion is due to be

granted and Moore's claims against Defendants Lee and Oswald dismissed for failure to exhaust.

In consideration of the foregoing, it is now

**ORDERED AND ADJUDGED**:

1.     The claims against Defendant H. George are **DISMISSED without prejudice**.

2.     Defendants Danielle M. Pippin[s] Lee and Tyler D. Oswald Motion to Dismiss and Incorporated Memorandum of Law (Doc. 24) is **GRANTED**. The claims against Defendant Lee and Defendant Oswald are **DISMISSED without prejudice**.

3.     The **Clerk** shall enter judgment dismissing this case without prejudice, terminate any pending motions, and close the file.

 **DONE AND ORDERED** at Jacksonville, Florida, this 24th day of February, 2021.


*Marcia Morales Howard*
**MARCIA MORALES HOWARD**
United States District Judge


Jax-7

C:     Darell Devon Moore, #J58406
        Counsel of record